#28436-r-DG
**2018 S.D. 49**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN RE SUPPORT LICENSE #A8365-14-SP

SOUTH DAKOTA
COMMISSION ON GAMING,                      Plaintiff and Appellant,

    v.

CHARLES JOHNSON,                           Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MICHELLE K. COMER
Judge

* * * *

MICHAEL F. SHAW
KATIE J. HRUSKA of
May, Adam, Gerdes &
 Thompson LLP
Pierre, South Dakota                       Attorneys for appellant.


ROGER A. TELLINGHUISEN
MICHAEL V. WHEELER of
DeMersseman, Jensen, Tellinghuisen
 & Huffman LLP
Rapid City, South Dakota                   Attorneys for appellee.

* * * *

ARGUED ON MAY 22, 2018
OPINION FILED **06/20/18**

#28436

GILBERTSON, Chief Justice

[¶1.] After concluding that Charles Johnson mishandled money while working in a casino and that he was dishonest in the subsequent investigation, the South Dakota Commission on Gaming revoked Johnson's gaming support license and banned him from entering any gaming establishment in South Dakota. Johnson appealed the Commission's decision to the circuit court, which reversed the Commission's decision. The Commission now appeals to this Court. We reverse the circuit court's decision and affirm the Commission's decision.

**Facts and Procedural History**

[¶2.] In September 2016, Charles Johnson held a gaming support license and was employed at Tin Lizzie's Casino in Deadwood as a dealer and pit supervisor. At the time, Johnson had held a gaming license in South Dakota for nearly three years. Before coming to South Dakota, Johnson had held a gaming license in the State of Washington, where he worked in the gaming industry for over 13 years.

[¶3.] On September 19, 2016, Johnson was working as a pit supervisor at Tin Lizzie's when Mark Haddad visited the casino. Johnson and Tin Lizzie's general manager, Austin Burnham, recognized Haddad as a suspected cheater and the subject of an ongoing investigation by the Commission. While Burnham attempted to contact the Commission, Johnson assumed the role of "stickman" at the craps table where Haddad began gambling. Unable to reach the Commission, Burnham returned to the table, where Johnson had already transitioned to the role

of dealer.[1] At the time Burnham returned, Haddad had $20 in chips on the table: one $15 bet, one $4 bet, and a $1 tip. Burnham asked Haddad for identification, and when Haddad refused, Burnham asked him to leave.

[¶4.] As Burnham asked Haddad to leave, Haddad placed his hand on the chips remaining in his tray. Johnson picked up the chips comprising Haddad's $15 bet and placed them in Haddad's chip tray. Still facing Burnham, Haddad walked away with only the chips in his tray that he had already placed his hand on; he left behind the $15 in chips that Johnson had returned to the tray. After Haddad left the table, Johnson picked up the $15 in chips from Haddad's tray as well as the other $5 in chips that Johnson had forgotten were still on the table. Johnson placed the chips next to the table's bank, placing a marker on top of the chips to indicate they were not part of the bank. After the only other player at the table left, Johnson placed the entire $20 in chips in the tip box.[2]

[¶5.] On September 29, 2016, Brandon Snyder, an enforcement agent working for the Commission, responded to Burnham's September 19 report. While reviewing video recordings of Haddad's activities at Tin Lizzie's, Agent Snyder noticed that Johnson had placed Haddad's chips in the tip box. On September 30, Agent Snyder interviewed Burnham as well as Tin Lizzie's table-games manager,

---

1.    According to the record, the stickman is in charge of the dice, and the dealer is in charge of the table's "bank" of chips. The words *dealer* and *stickman* are also defined by regulation. *See* ARSD 20:18:33:01(5) (defining *dealer* as "a casino employee who either works each end of the table or as a stickman at a table"); ARSD 20:18:33:01(9) (defining *stickman* as "the dealer who calls the game and handles the stick").

2.    Tin Lizzie's policy was to divide tips among all employees working at the time. Thus, Johnson personally received only $1.05 of the $20.

Donica Schumacher. Burnham and Schumacher both advised Agent Snyder that the casino's policy on found or unclaimed chips is to hold the chips if the identity of the owner is known and to place the chips in the cage if the owner is unknown.

[¶6.] Agent Snyder also interviewed Johnson on September 30, 2016, regarding the incident. Johnson asserted that when he returned the $15 in chips to Haddad's tray, he also informed Haddad that those chips belonged to Haddad. Johnson further asserted that a second player at the craps table also tried to tell Haddad that he had chips remaining at the table. When Agent Snyder asked Johnson what happened after the second player left, Johnson responded: "[W]ell we weren't going to get any more play, so, we didn't know what the guy wanted, so we just dropped it in the tip box." Agent Snyder asked Johnson to provide a written statement on a form provided by the Commission. When agent Snyder returned to Tin Lizzie's several days later, he saw a blank form like the one he left for Johnson and assumed Johnson had not completed it.

[¶7.] On November 4, 2016, Agent Snyder filed a complaint against Johnson, alleging that he took the property of another without notifying the box person or pit supervisor. Johnson answered the complaint sometime in November or early December 2016.[3] In his answer, Johnson's account of the September 19, 2016 incident changed. Whereas Johnson indicated in his September 30 interview with Agent Snyder that he did not know what Haddad intended by leaving the $20 in chips, Johnson claimed in his answer to the complaint that he "believed [Haddad]

---

3. Johnson's written response is undated, but on December 6, 2016, the Commission sent a letter to Johnson that acknowledges receipt of his response.

was leaving the chips for the dealers since [Haddad] was trying to tip us anyway." In the answer, Johnson also claimed he made two attempts before Haddad walked away—rather than one—to tell him that he had left money at the table. Johnson further claimed in the answer that "[w]hen [Haddad] was about half way out [of] the room, [Johnson] yelled to him once more 'that he left chips on the table.'"

[¶8.] When Johnson submitted his answer to the complaint, he also submitted the written statement that Agent Snyder had requested on September 30, 2016. The factual assertions in this written statement, which is dated September 30, vary slightly from both Johnson's interview with Agent Snyder and Johnson's answer to the complaint. In the statement, Johnson claimed making three attempts before Haddad walked away to tell him that he had left money at the table. But the written statement makes no mention of yelling at Haddad after Haddad was halfway out of the room. And while Johnson indicated in his interview that he did not know what Haddad intended to happen to the $20 in chips, and he indicated in his answer that he affirmatively believed Haddad intended the chips to be a tip, Johnson instead indicated in the written statement that he "assumed" the money was intended to be a tip.

[¶9.] The Commission responded to Johnson's answer on December 6, 2016. Larry Eliason, the Commission's Executive Secretary, informed Johnson that the matter could be resolved through an informal meeting rather than a formal hearing. Johnson and Secretary Eliason met informally on January 5, 2017. Secretary Eliason offered to settle the matter by suspending Johnson's gaming support license for 30 days. Johnson declined, choosing to proceed to a formal hearing. After

leaving the meeting, however, Johnson returned to speak with Secretary Eliason. Johnson handed $20 to Secretary Eliason and said: "If you think I was a thief and dishonest there's his $20." Secretary Eliason refused to accept the money.

[¶10.] The Commission held a formal hearing on March 22, 2017. Agent Snyder, Secretary Eliason, and Johnson each testified at the hearing. In addition to testimony, the Commission viewed a video-only recording of Johnson's alleged misconduct from September 19, 2016. The Commission also viewed video and audio recordings of Johnson's attempt to give $20 to Secretary Eliason after their January 5, 2017 meeting. The Commission concluded that Johnson violated two administrative regulations by placing a patron's chips in the tip box and by being untruthful in the subsequent investigation. Considering these infractions, Johnson's attempt to give $20 to Secretary Eliason, and a previous suspension of Johnson's gaming license, the Commission decided to revoke Johnson's gaming license and exclude him from all gaming establishments in South Dakota.

[¶11.] Johnson appealed the Commission's decision to the circuit court. On appeal, the court's review was confined to the administrative record. The court held that several of the Commission's factual findings are clearly erroneous, including the Commission's findings that the $20 in chips belonged to Haddad and that Johnson was dishonest during the investigation. The court also held that the sanction imposed by the Commission was an abuse of discretion.

[¶12.] The Commission now appeals to this Court, raising the following issues:

> 1. Whether the Commission erred by concluding Johnson acted dishonestly or fraudulently.

2.   Whether the Commission erred by concluding Johnson failed to report an irregularity.

3.   Whether the Commission abused its discretion by revoking Johnson's license and adding him to the exclusion list.

### Standard of Review

[¶13.]   The central issue in this appeal is the formal adjudication of a contested case by an administrative agency. Therefore, this appeal is governed by South Dakota's Administrative Procedures Act, SDCL chapter 1-26. When the circuit court's review is limited to the administrative record,[4] on appeal this Court makes "the same review of the administrative tribunal's action as did the circuit court." *Dakota Trailer Mfg., Inc. v. United Fire & Cas. Co.*, 2015 S.D. 55, ¶ 11, 866 N.W.2d 545, 548 (quoting *Peterson v. Evangelical Lutheran Good Samaritan Soc'y*, 2012 S.D. 52, ¶ 13, 816 N.W.2d 843, 847). Questions of law are reviewed de novo. *Id.* Matters of reviewable discretion are reviewed for abuse. SDCL 1-26-36(6). The agency's factual findings are reviewed under the clearly erroneous standard. SDCL 1-26-36(5). The agency's decision may be affirmed or remanded but cannot be reversed or modified absent a showing of prejudice. SDCL 1-26-36.

### Analysis and Decision

[¶14.]   The ultimate question in this appeal is whether the Commission abused its discretion by revoking Johnson's gaming support license and placing him

---

4.   The circuit court's review is usually confined to the administrative record. SDCL 1-26-35. However, "in cases of alleged irregularities in procedure before the agency, not shown in the record, proof thereon may be taken in the court." *Id.* A circuit court's factual findings and legal conclusions regarding such proof of irregularities would be entitled to the usual deference afforded a circuit court. SDCL 1-26-37. But this appeal does not involve SDCL 1-26-35.

on the exclusion list. The Commission cited three reasons for its decision. First, the Commission found that the $20 in chips belonged to Haddad, that Johnson did not attempt to determine Haddad's identity, and that consequently, Johnson's placing the $20 in chips in the tip box "constituted dishonest or fraudulent conduct" in violation of ARSD 20:18:09:02. Second, as a further violation of ARSD 20:18:09:02, the Commission found that Johnson was dishonest in statements he made during the investigation and hearing. And third, the Commission found that Johnson violated ARSD 20:18:33:11 and Tin Lizzie's in-house policy by failing to report an irregularity to his immediate supervisor. The circuit court reversed the Commission's decision on each of these points.

[¶15.]   **1.   *Whether the Commission erred by concluding Johnson acted dishonestly or fraudulently.***

[¶16.]   The Commission first determined that Johnson violated ARSD 20:18:09:02, which states: "Any act, whether of the same or of a different character than specified in this article, that constitutes dishonesty or fraudulent conduct, whether arising within or without the pursuit of the license privilege, committed by a licensee is grounds for disciplinary action." The Commission found that the $20 in chips belonged to Haddad, that Johnson did not attempt to identify Haddad, and that consequently, Johnson's taking the chips and placing them in the tip box was dishonest or fraudulent. The circuit court rejected the Commission's finding as a factual matter, concluding there was "[n]o evidence produced to show the money was not in fact left as a 'tip.' The Commission's findings assume and presuppose it to be found money despite complete lack of evidence."

[¶17.] The circuit court did not review the Commission's factual findings under the correct standard. As noted above, the court was required to "give great weight to the findings made and inferences drawn by [the Commission] on questions of fact." SDCL 1-26-36. The Commission's factual findings may be set aside only if they are "[c]learly erroneous in light of the entire evidence in the record[.]" SDCL 1-26-36(5). Thus, the question is whether "a complete review of the evidence leaves the Court with a definite and firm conviction that [the Commission made] a mistake" by finding that the $20 in chips belonged to Haddad. *See Aguilar v. Aguilar*, 2016 S.D. 20, ¶ 9, 877 N.W.2d 333, 336 (quoting *Clough v. Nez*, 2008 S.D. 125, ¶ 8, 759 N.W.2d 297, 301).

[¶18.] There is sufficient evidence in the administrative record to prevent the conclusion that the Commission's factual findings on this matter are clearly erroneous. It is undisputed that at the beginning of the September 19, 2016 encounter, Haddad owned the $20 in chips at issue. It is also undisputed that Haddad overtly exercised ownership of the chips by placing $19 in chips as wagers and a $1 chip as a tip. It is further undisputed that Johnson ultimately took the $20 in chips from the table and placed them in the tip box. This is prima facie evidence that supports the complaint's allegations that Johnson took money belonging to a patron and placed it in the tip box. Consistent with Haddad's apparent ownership of those chips, Johnson attempted (at least once) to return them to Haddad when he started to walk away from the table. Even after Haddad walked away, Johnson did not immediately place the chips in the tip box; rather, Johnson continued to treat the chips as the property of a recognized and identifiable

patron by placing them aside and marking them as separate from the table's bank. It was only after all other players left the table that Johnson finally placed Haddad's chips in the tip box. Johnson's earliest account of the September 19, 2016 incident also supports the conclusion that Haddad did not intend to leave $20 in chips as a tip—when interviewed by Agent Snyder on September 30, Johnson stated that he "didn't know what [Haddad] wanted" to do with the chips.

[¶19.] In contrast to the evidence that supports the Commission's factual findings, neither Johnson nor the circuit court have identified any evidence—aside from Johnson's own statements—that affirmatively supports the assertion that Haddad intended to leave his chips as a $20 tip. The only support for this view is Johnson's answer to the complaint, in which he affirmatively claimed that he thought the money was intended to be a tip. But as noted above, Johnson's answer contradicts his interview statement, in which he indicated he did not know what Haddad intended. His answer also contradicts his written statement, in which he indicated he merely assumed the chips were intended as a tip. Considering the evidence discussed above, Johnson's inconsistent version of the September 19, 2016 incident is not sufficient to create a definite and firm conviction that the Commission made a mistake.

[¶20.] In addition to finding that Johnson acted dishonestly or fraudulently in placing Haddad's chips in the tip box, the Commission also found that Johnson was dishonest in statements he made during the investigation and hearing. Specifically, the Commission found that Johnson's claim that he repeatedly attempted—including yelling—to inform Haddad that the chips belonged to Haddad

was dishonest. The Commission specifically found Johnson's testimony and claims on this point not credible. Even so, the circuit court held that because the video recording of September 19, 2016, does not include audio, "there was no evidence presented to dispute Johnson's assertions."

[¶21.] Again, the circuit court failed to apply the appropriate standard of review. Because the Commission is the only tribunal involved in this case that has seen and heard Johnson testify, the court was required to give "due regard" to the Commission's credibility determinations. *Foley v. State ex rel. S.D. Real Estate Comm'n*, 1999 S.D. 101, ¶ 9, 598 N.W.2d 217, 220. And importantly, the record supports the Commission's credibility determination. As noted above, Johnson's account of the September 19, 2016 incident varied between his interview, his answer to the complaint, his written statement, and his hearing testimony. Johnson's first account mentioned notifying Haddad of the chips only once. But in his answer to the complaint, Johnson claimed he made two attempts to notify Haddad before Haddad left the table and that he then yelled to Haddad while Haddad was halfway across the room. Then in his written statement, Johnson claimed he made three attempts to notify Haddad—all made before Haddad left the table. Finally, at the hearing, Johnson denied yelling to Haddad. And as the Commission noted in its findings, the video recording of the incident does not give any visual indication to support Johnson's claims.

[¶22.] In light of the foregoing, the Commission did not err by concluding Johnson violated ARSD 20:18:09:02. A complete review of the record does not create a definite and firm conviction that the Commission erred in finding that

Johnson placed chips belonging to a patron in the tip box. Nor does that review create a definite and firm conviction that the Commission erred in finding that Johnson was dishonest during the investigation and hearing. Therefore, the circuit court erred by disregarding the Commission's factual findings.

[¶23.] **2.** **Whether the Commission erred by concluding Johnson failed to report an irregularity.**

[¶24.] The Commission also determined that Johnson's conduct on September 19, 2016, violated ARSD 20:18:33:11, which states:

> If any irregularity occurs, the dealer shall notify the box person or pit supervisor, who shall direct the dealer to take the most appropriate action which the box person or supervisor believes to be fair and equitable, and shall observe such action being taken. The box person or pit supervisor, and not the dealer, must make all decisions concerning disputed play or the payment or collection of wagers.

The Commission contends that the disposition of Haddad's $20 in chips concerns "the payment or collection of wagers" under ARSD 20:18:33:11. Because Johnson was functioning as the dealer, the Commission concludes that he was prohibited from making any decision concerning those wagers and that he was required to report the issue to a supervisor. The circuit court held as a matter of law that the Commission misinterpreted ARSD 20:18:33:11. Noting that on September 19, 2016, Johnson was acting as both dealer and pit supervisor, the court concluded that Johnson was not required to seek guidance from anyone else. In essence, while the Commission viewed Johnson's status as a dealer as overriding his status as the pit supervisor, the court viewed Johnson's status as a pit supervisor as overriding his status as a dealer.

[¶25.]     We decline to address this issue. As noted above, the Commission's factual findings support its conclusion that Johnson's conduct on September 19, 2016, violated ARSD 20:18:09:02. Therefore, it is not necessary to determine whether that same conduct also violated ARSD 20:18:33:11.

[¶26.]     **3.     *Whether the Commission abused its discretion by revoking Johnson's license and adding him to the exclusion list.***

[¶27.]     The final issue involves the sanction that the Commission imposed on Johnson. As noted above, during their January 5, 2017 meeting, Secretary Eliason offered Johnson a 30-day suspension to settle the matter. But after the March 22, 2017 hearing, the Commission ultimately revoked Johnson's gaming support license and excluded him from all gaming establishments in South Dakota. In the circuit court's view, "[t]he only thing that changed during that time frame was that Johnson exercised his right to a hearing as allowed pursuant to the applicable statutes and procedures." Thus, the circuit court held that the sanction was an abuse of discretion as measured relative to Secretary Eliason's settlement offer rather than as an absolute measure.

[¶28.]     The circuit court's reasoning misperceives the role of the executive secretary. The executive secretary makes recommendations to the Commission, but he is not a commissioner and so is not involved in the actual adjudication of a contested case. Secretary Eliason's offer to settle the complaint was analogous to the State offering a plea agreement to a criminal defendant. The Commission was no more required to adhere to the terms of Secretary Eliason's rejected settlement offer than a sentencing court is required to adhere to a rejected plea agreement.

[¶29.]    The Legislature expressly gave the Commission power both to revoke gaming licenses, *see* SDCL 42-7B-11, and to create a list of persons to be excluded from all licensed gaming establishments, *see* SDCL 42-7B-61. In reaching its decision, the Commission considered both Johnson's dishonesty in taking chips that belonged to a patron and placing them in the tip box and his dishonesty in giving varying accounts of the September 19, 2016 incident. The Commission also considered its previous suspension of Johnson's gaming license. Finally, the Commission considered Johnson's attempt to give $20 to Secretary Eliason. The Commission—the agency specifically tasked by the Legislature with administering gaming in South Dakota—found that the totality of Johnson's conduct "could create or enhance a risk of the fact or appearance of unsuitable, unfair or illegal practices and activities in the conduct of gaming." The Commission did not abuse its discretion.

## Conclusion

[¶30.]    The Commission's factual finding that Johnson took money belonging to a patron and placed it in the tip box is not clearly erroneous. Nor is the Commission's factual finding that Johnson was dishonest in the subsequent investigation clearly erroneous. The sanction imposed by the Commission was within its discretion.

[¶31.]    We reverse the circuit court's decision and affirm the Commission's decision.

[¶32.]    ZINTER, KERN, and JENSEN, Justices, and SEVERSON, Retired Justice, concur.